# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| THOMAS STAFFELD, | CASE NO. 05cv2298 BTM (WMc) |
|---|---|
| Plaintiff, | **ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [Doc. #21]** |
| vs. | |
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA; LEAP WIRELESS INTERNATIONAL DISABILITY PLAN #502, | |
| Defendants. | |

On December 16, 2005, Plaintiff Thomas Staffeld filed a complaint against Defendants The Prudential Insurance Company of America (hereinafter "Prudential") and the Leap Wireless International Disability Plan #502 (the "Plan") under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1101, *et seq.* ("ERISA") for failure to pay Short Term Disability ("STD") and Long Term Disability ("LTD") benefits per the terms of the Plan. On March 16, 2006, a Stipulation and Order was filed, stipulating that the court shall apply a *de novo* standard of review for assessing Plaintiff's disability claims, unless required by law to do otherwise. On October 11, 2006, Defendants filed a motion for summary judgment.

For the reasons discussed below, the Court **DENIES** Defendants' motion.

//
//

## I. FACTUAL BACKGROUND

### A. The Disability Plan

At the time of Plaintiff's alleged disability, he was an employee of Leap Wireless International ("Leap"), which had obtained an employer-sponsored benefit program for short and long-term disability from Prudential (the "Plan"; Group Policy G-40946-CA). (See Prudential's Claim File ("Claim File"), PRU1-72.) Under the terms of the Plan, a person is "disabled" and entitled to STD benefits if, after a 7 day elimination period during which the person performs no work, he or she is then "unable to perform the material and substantial duties of [his or her] regular occupation due to [his or her] sickness or injury; . . . [has] a 20% or more loss in weekly earnings due to the same sickness or injury; and . . . [is] under the regular care of a doctor." (Claim File, PRU36.) The Plan contains an exclusion to the STD clause, whereby injuries "arising out of, or in the course of, any work . . . or a sickness covered . . . by any workers' compensation law, occupational disease law or similar law" are excluded from benefit coverage. (Id. at PRU40.)

Per the terms of the Plan, a person is entitled to LTD benefits if he or she is "unable to perform the material and substantial duties of [his or her] regular occupation due to [his or her] sickness or injury; . . . [has] a 20% or more loss in [his or her] indexed monthly earnings due to that sickness or injury; and . . . [is] under the regular care of a doctor." (Id. at PRU45.) Additionally, after 24 months of payments, a person is entitled to LTD when "due to the same sickness or injury, [he or she] is unable to perform the duties of any gainful occupation for which [he or she is] reasonably fitted by education, training, or experience." (Id.) For both the short and long term disability benefits, the Plan defines "material and substantial duties" as those duties which are "normally required for the performance of [the person's] regular occupation; and cannot be reasonably omitted or modified." (Id. at 45; see also PRU36-37.)

### B. Plaintiff Files a Disability Claim

Over the past twenty years, Plaintiff has reported having chronic, painful headaches of increasing severity. (Id. at PRU79, 92.) On July 9, 2002, Plaintiff did not go to work, and

on July 11 he saw Dr. Charles Moss complaining of severe headaches.  (Id. at PRU110.)  Also on July 11, 2002, Plaintiff submitted a claim for disability benefits with Prudential, citing "chronic headaches which are exacerbated by work induced stress" as his disability, and answering yes to the question, "[i]s this condition work related?"  (Id. at PRU449.)  On this claim, Plaintiff left blank a box asking if he "intend[ed] to file a Workers' Compensation claim" and wrote in a question mark next to the box.  (Id.)  On the Employer Statement, dated August 30, 2002, a Leap Representative stated that Plaintiff had not indicated that his absence from work was work-related, and that a workers' compensation claim had not been filed.  (Id. at PRU458.)  In a September 5, 2002 telephone call, Plaintiff informed Prudential that he was "stressed out" at work, had lost 20 pounds (down to 145 pounds at 6 feet tall), and had "severe worsening" headaches.  (Id. at PRU512 (quotations from Prudential Call Log, paraphrasing Plaintiff's description).)  On September 6, 2002, Prudential denied Plaintiff's STD claim, citing their belief that his "condition [was] caused by, contributed by, or resulting from [his] occupational sickness or injury" and thus excluded under the work-related injury clause of the Plan.  (Id. at PRU507-8.)  On October 7, 2002, Plaintiff filed a Reimbursement Agreement, and requested that Prudential honor his claim for STD benefits. (Id. at PRU446.)  He stated that he had not filed for workers' compensation benefits because he was unsure if his disability was work-related.  (Id.)  On October 29, 2002, in light of the Reimbursement Agreement, Prudential approved STD benefits for the period through July 29, 2002 stating that "the medical information submitted . . . supports a period of disability . . .."  (Id. at PRU503-4, 543, 545.)  At this time, Prudential requested that Plaintiff submit additional medical records from May 2002 if Plaintiff wished to pursue additional benefits. (Id. at PRU503.)  Plaintiff then submitted additional medical records, and was denied LTD benefits on December 19, 2002, owing to Prudential's belief that the "medical information in file [did] not support that [he] had a significant change in [his] chronic headaches and nor [did] it support that [he had] impairments severe enough to prevent [him] from performing the material and substantial duties of [his] regular occupation."  (Id. at PRU498-501.)

On February 12, 2004, October 5, 2004, and March 27, 2005, after submission and

consideration of additional medical records from various doctors regarding the claimed disability, Prudential denied Plaintiff's first, second, and third appeals for benefits, respectively. (Id. at PRU472-494.) On December 16, 2005, having exhausted the appeals process at Prudential, Plaintiff filed this suit under ERISA, 29 U.S.C. § 1101, *et seq.*

**C. Evidence in Prudential's Record Pertaining to the Disability**

There is no shortage of medical opinions on the issue of Plaintiff's alleged disability. Much of the administrative record is summarized as follows:

In the initial Attending Physician's Statement, dated August 1, 2002, Dr. Charles Moss indicated a primary diagnosis of Acute Stress Syndrome, with secondary diagnoses of weight loss and headaches. (Id. at PRU454-56.) The administrative record contains nine patient intake records from the office of Dr. Moss, between the dates of July 11, 2002 (the date Plaintiff filed for disability) and November 6, 2002, indicating headaches and fatigue. (Id. at PRU110-118.) Also found in Prudential's records are numerous notes from Dr. Moss's office indicating Plaintiff's presence there throughout the years of 2002 and 2003. (Id. at PRU405-433.)

The record contains a 1997 X-Ray report from Dr. Van Lom at Scripps Memorial Hospital, indicating "the height of the C6 vertebrae appears slightly diminished" and opining that "perhaps this is related to some prior trauma." (Id. at PRU353.)

On December 31, 2002, Plaintiff saw Dr. Aderholdt at Alvarado Hospital. (Id. at PRU356.) Prudential's record contains Dr. Aderholdt's Radiology Report, which states: "Ther [sic] is moderate loss of vertebral body height affecting both the C5 and C6 levels. Mild associated degenerative change is suggestive of old injury." (Id.)

The record contains a February 4, 2003 letter from Dr. Isaac Bakst indicating that previous doctors have attributed Plaintiff's headaches to a 1975 head injury, suffered during a 30 foot fall, and have suspected that Plaintiff suffered from disc degeneration of the cervical spine. (Id. at PRU107.) Dr. Bakst observed "tenderness in the left aspect of the neck" and "superior orbit" of the head, and noted that Plaintiff reported increasing severity of the headaches and weight loss. (Id.) Dr. Bakst stated that "there is probably an aspect of this

headache that is related to the continued use of Fiorinal and Codeine" and he suggested Botox treatment. (Id. at PRU108-109.)

Dr. Bakst referred Plaintiff to Dr. Jack Schim for neurologic evaluation. On February 21, 2003, Dr. Schim sent a letter to Dr. Bakst indicating his evaluation of previously administered medical tests, stating: "[Plaintiff] has had extensive imaging work-up in the past, including MRI of the brain which I have reviewed, which was negative, a PET scan which appears normal, and cervical spine MRI which shows mild cervical degenerative disk changes." (Id. at PRU79-82.) Dr. Schim opined that there might have been an element of analgesic rebound[1] present, stating:

> Dr. Staffeld has chronic daily headaches which have predominantly features of chronic tension-type headache. As he is certainly using daily analgesics, the possibility that there is a rebound element must be considered though his history that he went 10+ years experiencing daily headaches not using analgesics and has tried being off analgesics for up to a month without improvement in his headache, suggest that he may be simply "chasing his pain" rather than rebound per se. Nevertheless, the likelihood of response to another preventive oral agent is very slim, having failed several thus far.

(Id. at PRU81.) Dr. Schim also suggested Botox injections for treatment of Plaintiff's headaches. (Id.)

Between May 8, 2003, and September 24, 2004, Plaintiff saw Dr. Hussein Abdulhadi at Alvarado Hospital at least 27 times for his headaches. The record contains patient intake records for each of these visits, in which Plaintiff reported headaches and Dr. Abdulhadi prescribed numerous pain medications and Botox treatments. (Id. at PRU125-146, 364-390.) In a May 7, 2004 outpatient visit, Dr. Abdulhadi diagnosed a "bioccipital, bifrontal and retroorbital" daily headache, and noted that Plaintiff scored the pain between 6 and 8 on a 0 to 10 scale. (Id. at PRU125.) Dr Abdulhadi noted that the pain interfered with Plaintiff's

---

[1] "Analgesic rebound" has been described as a condition by which an individual's headache is at least partially caused by the overuse of analgesic (pain-relieving) medication. See Family Practice News, "Chronic Headaches Due to Analgesic Overuse Reach Epidemic Levels" (May 1, 2001), available at http://findarticles.com/p/articles/mi_m0BJI /is_9_31/ai_75176535 (last visited Feb. 12, 2007).

1  ability to work and perform recreational activities.[2]  (Id.)  In a Consultation Memo dated

2  November 24, 2003, Dr. Abdulhadi noted that [Plaintiff] "is disabled as he is limited by his

3  headache and neck pain." (Id. at PRU339.)  The doctor then stated:

> Headache and pain in general are a subjective phenomenon. There is no objective test that can reveal objective data to quantitate the amount of pain the patient is in; in fact, pathology and pain do not correlate together. Again the patient's disability remains as perceived by the patient because of pain otherwise there is no physical limitation.

7  (Id. at PRU340.)

8  During this time, Dr. Abdulhadi referred Plaintiff to Dr. Charles Farrow. Between

9  August 27, 2003 and October 10, 2003, Plaintiff saw Dr. Farrow on eight occasions for

10  neuropsychological examination. (Id. at PRU322.) The record contains an October 14, 2003

11  report from Dr. Charles Farrow relating the results of these examinations. (Id.) In this report,

12  Dr. Farrow suggested the possibility of right hemispheric brain damage, and noted that the

13  "findings suggest[ed] that Mr. Staffeld indeed is struggling with his head injury and sequelae,

14  and that he is not a true conversion disorder."[3]  (Id. at PRU333.)  Dr. Farrow concluded his

15  extensive report with the following:

> Given the functional problems listed above and the clear statistical significance of many variables, *there is reason to believe that Mr. Staffeld suffered a rather severe concussion 20 years ago*. Historically, this fits with the data of severe headaches since that time, as many persons who suffered a closed head injury will suffer post-traumatic headaches for years. Given the poor treatment results to migraine headache treatments, *the diagnosis of post-traumatic headache seems likely*. While he clearly fluctuates in his capacity to cope with his problem, the very fact that the skills most impaired by his trauma were the ones he relied on at work suggests that his headaches would have been exacerbated by his efforts to use his negatively affected resources. *In sum, it is clear that he is struggling with a pain disorder with both medical and psychological components*.

(Id. (emphasis added).)

---

[2] It is unclear from the record if Plaintiff informed Dr. Abdulhadi that the pain interfered with his ability to work and perform recreational activities, or if the doctor independently determined these facts.

[3] Merriam Webster's Medical Dictionary defines "conversion disorder" as: "a psychoneurosis in which bodily symptoms (as paralysis of the limbs) appear without physical basis -- called also conversion hysteria, conversion reaction." Merriam-Webster's Medical Dictionary, at http://www.merriam-webster.com/cgi-bin/mwmedsamp?book=Medical&va= sample (last visited Feb. 12, 2007) (internal emphasis omitted).

On February 12, 2004, Prudential denied Plaintiff's first appeal for extended STD and LTD benefits. (Id. at PRU491.)

On July 26, 2004, Dr. Moss sent a letter to Prudential stating that Plaintiff had been "disabled by the severity of the headaches during the past year." (Id. at PRU245-46.) Dr. Moss also described the variety of treatments that had been applied to Plaintiff - Botox, various pain medications, acupuncture - and noted that these treatments had provided no significant improvement in Plaintiff's condition. (Id. at 245.) Dr. Moss noted that Plaintiff's headaches "are described as continual, severe, and disabling"[4] and stated that Plaintiff had been "unable to concentrate, read, or function intellectually." (Id.) Dr. Moss also noted Plaintiff's "significant weight loss in the last six months to one year." (Id.) Additionally, Dr. Moss stated that, while a prior PET scan and MRI of Plaintiff's brain were "normal," a previously performed MRI of the cervical spine showed "degenerative changes at C5-6 and cervical myospasm." (Id.) Finally, Dr. Moss stated: "With [Plaintiff's] failure to respond to any therapeutic intervention at this time, I feel he will maintain a chronic disability state." (Id. at PRU246.)

In late 2004, Prudential hired Dr. Goldschmidt to perform an independent medical review of Plaintiff's file. (Id. at PRU306-310.) In Dr. Goldschmidt's September 23, 2004 report, he indicated that Plaintiff's headaches were "subjective" and without "any defined organic basis." (Id. at PRU308.) Dr. Goldschmidt stated that "[s]ince MRI brain and PET brain [scans] were normal, it is also unlikely that the claimant is demonstrating the effects of alleged brain injury without loss of consciousness, thirty years earlier." (Id.) Dr. Goldschmidt considered the following diagnoses: "Malingering to get drugs (narcotics, psychostimulants, and barbiturates); Factitious disorder; Somatoform Disorder;[5] Psychogenic

---

[4] It is unclear from this letter as to whom Dr. Moss is attributing this description.

[5] Merriam Webster's Medical Dictionary defines "somatoform disorder" as: "any of a group of psychological disorders (as body dysmorphic disorder or hypochondriasis) marked by physical complaints for which no organic or physiological explanation is found and for which there is a strong likelihood that psychological factors are involved." Merriam-Webster's Medical Dictionary, at http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=somatoform (last visited Feb. 14, 2007).

pain;[6] Polysubstance Abuse; Personality Disorder NOS with Passive-Aggressive, Dependent, and Antisocial traits; and Dysthymia[7] secondary to personality dynamics." (Id.) Dr. Goldschmidt also stated that "[p]otential rebound headaches from his Fiorinal should also be considered." (Id.) Dr. Goldschmidt opined that Plaintiff's "substance abuse represents a facilitated illness based on his physicians willingness to prescribe high dose narcotics for subjective complaints of pain," and that Plaintiff had "apparently . . . decided that it was time to retire." (Id. at PRU309.)

Also found in the record is an October 1, 2004 letter from Dr. Moss to the Department of Social Services, stating: "[Plaintiff] continues to have chronic fatigue and chronic daily headaches with no improvement or any response to medications. The neuropsychologist evaluation showed evidence of posttraumatic headaches. [Plaintiff] is unable to perform any work because of his pain level. The prognosis is poor for significant improvement." (Id. at PRU165.)

On October 5, 2004, Prudential denied Plaintiff's second appeal for LTD benefits. (Id. at PRU479.)

In late 2004, Plaintiff had moved to Oregon and began seeing Dr. Stephen Ireland at the Neurological Center of Bend. (Id. at PRU91-97.) The administrative record contains a November 19, 2004 letter from Dr. Ireland stating that Plaintiff's headaches are "vertex oriented" and noting that previous MRI scans of the brain and cervical spine "failed to demonstrate any explanatory abnormalities." (Id. at PRU92.) Dr. Ireland suggested that "it is quite likely that [Plaintiff] is in analgesic rebound" which could "provok[e] his headaches . . . [and] drastically decrease his responsiveness to standard anti-headache therapy." (Id. at PRU93.)

---

[6] "Psychogenic pain" is defined as pain which is "originating in the mind or in mental or emotional conflict." Id. at http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=psychogenic (last visited Feb. 14, 2007).

[7] "Dysthymia" is defined as "a mood disorder characterized by chronic mildly depressed or irritable mood often accompanied by other symptoms (as eating and sleeping disturbances, fatigue, and poor self-esteem)." Id. at http://www2.merriam-webster.com/cgi-bin/mwmednlm (last visited Feb. 14, 2007).

The record also contains a December 10, 2004 letter from Dr. Ireland indicating Plaintiff's success in discontinuing use of analgesics, though Plaintiff continued to suffer "very severe headaches." (Id. at PRU91.)  Dr. Ireland did note that he had never seen Plaintiff "exhibit any outward evidence of severe pain," and commented that "[t]his may be the result of a very stoical nature, but it is distinctly unusual to have such severe headaches and look so comfortable." (Id.)

Finally, as part of his third appeal, Plaintiff submitted a March 22, 2005 letter from the Social Security Administration indicating that Plaintiff was found to be disabled, as of July 9, 2002, under the Administration's requirements for disability. (Id. at PRU176.)  The Social Security Administration defines "disability" as: "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months . . .." (Id. at PRU178.)

On March 27, 2005, Prudential denied Plaintiff's third and final appeal for extended STD and LTD  benefits. (Id. at PRU472.)

**II. Legal Standard**

Summary judgment is appropriate if the moving party demonstrates that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  See Anderson, 477 U.S. at 248; Freeman v. Arpaio,125 F.3d 732, 735 (9th Cir. 1997).  A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party. See Anderson, 477 U.S. at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. See Celotex, 477 U.S. at 323.  Although the nonmoving party bears the burden of proof on a matter at trial, the moving party must

demonstrate to the Court that there is insufficient evidence to support the nonmoving party's case. Id. at 325.  The moving party, after allowing adequate time for discovery, can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to establish an essential element of the nonmoving party's case on which the nonmoving party bears the burden of proof at trial.  See id. at 322-23.  "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment."  T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

Once the moving party establishes the absence of genuine issues of material fact, the burden shifts to the nonmoving party to set forth facts showing that a genuine issue of disputed fact remains.  See Celotex, 477 U.S. at 324.  The nonmoving party cannot rest on the mere allegations or denials of his pleading, but must "go beyond the pleadings and by his own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" Id. (citing Fed. R. Civ. P. 56)).  When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party.  See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Fontana v. Haskin, 262 F.3d 871, 876 (9th Cir. 2001).  The court must not weigh the evidence or make credibility determinations in evaluating a motion for summary judgment.  See Anderson, 477 U.S. at 255.

**III. Discussion**[8]

The parties to this case stipulate that the standard of review for determining the propriety of Prudential's denial of Plaintiff's claim is *de novo.*  As such, and because the other requirements of the Plan appear undisputed, the ultimate issue before this court is whether Plaintiff was "unable to perform the **material and substantial duties** of [his] **regular**

---

[8] Because the Plan's standards for short and long term disability do not differ on material issues, except in the event LTD is paid for 24 months, the following analysis shall apply to claims for both STD and LTD benefits.

1 **occupation** due to [his] **sickness** or **injury**" such that Plaintiff should be entitled to recover STD and LTD benefits during the respective and appropriate time periods. (Id. at PRU36, PRU45.) Additionally, if the Court finds that Plaintiff met this standard for LTD, it must then determine if, for the period after 24 months of LTD payments would have been made, Plaintiff was, and is, "unable to perform the duties of **any gainful occupation** for which [he is] reasonably fitted by education, training, or experience." (Id. at 45 (emphasis added).)

Under the *de novo* standard, deference is not accorded to the determination made by Prudential, and discussion of Prudential's reasonableness in denying Plaintiff's claim is irrelevant. Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101 (1989); Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan, 46 F.3d 938, 942 (9th Cir. 1995).

### A. Plaintiff's Declaration

Defendants object to Plaintiff's declaration as unwarranted evidence not contained in the record originally before Prudential. As a general rule, a district court may consider only the evidence which had been before the Plan administrator at the time of the administrator's ruling. Silver v. Executive Car Leasing Long-Term Disability Plan, 466 F.3d 727, 732 (9th Cir. 2006). This exclusionary rule is based upon the underlying principle that courts should not function as "substitute plan administrators," and the admission of additional evidence would "frustrate the goal of prompt resolution of claims by the fiduciary under the ERISA scheme." Taft v. Equitable Life Assurance Soc'y, 9 F.3d 1469, 1471-1472 (9th Cir. 1993) (quoting Perry v. Simplicity Eng'g, 900 F.2d 963, 966 (6th Cir. 1990)). However, when a Court is reviewing the administrator's decision *de novo*, the Court has discretion to consider new evidence "under certain circumstances to enable the full exercise of informed and independent judgment." Mongeluzo, 46 F.3d at 943-44. The Mongeluzo Court noted that this discretion must be tempered in order to effectuate the purposes behind ERISA, and "[i]n most cases, where additional evidence is not necessary for adequate review of the benefits decision, the district court should only look at the evidence that was before the plan administrator . . . at the time of the determination." Id. at 944 (quoting Quesinberry v. Life Ins. Co. of N. Am., 987 F.2d 1017, 1025 (4th Cir. 1993)).

In this instance the record before the Court is replete with observations and diagnoses by medical doctors, and the Court finds this record sufficient to facilitate the making of a proper and informed *de novo* review of Plaintiff's benefits claim. The Court therefore declines to exercise its discretion and has not considered Plaintiff's declaration.

**B.  Facts Supporting Summary Judgment**

In light of the complexity of Plaintiff's affliction and alleged disability, there is no shortage of documented opinions regarding his headaches. Defendants submit some of these opinions in an effort to negate the essential elements of Plaintiff's disability claim. Much of this evidence stands for the proposition that Plaintiff's pain is exaggerated or the result of Plaintiff's well-documented use of prescription pain medications.

In support of their belief that Plaintiff's pain is entirely subjective, or exaggerated, Defendants point to statements by Drs. Ireland and Abdulhadi. As noted above, Dr. Ireland indicated that he had never seen Plaintiff "exhibit any outward evidence of severe pain" and found this unusual given Plaintiff's alleged disability. (Claim File, PRU91.) Dr. Abdulhadi remarked, somewhat cryptically: "[T]he patient's disability remains as perceived by the patient because of pain otherwise there is no physical limitation." (Id. at PRU340.) Defendants also argue that Plaintiff did have the ability to work despite the headaches, as evidenced by the fact that he had been doing so for the past 20 years and had shown no objective evidence of a recent increase in pain. The relevance of this fact is questionable at best. Judge Posner, in addressing a similar claim, stated:

> This [assumption] would be correct were there a logical incompatibility between working full time and being disabled from working full time, but there is not. A desperate person might force himself to work despite an illness that everyone agreed was totally disabling. Yet even a desperate person might not be able to maintain the necessary level of effort indefinitely. [The plaintiff] may have forced himself to continue in his job for years despite severe pain and fatigue and finally have found it too much and given it up even though his condition had not worsened. A disabled person should not be punished for heroic efforts to work by being held to have forfeited his entitlement to disability benefits should he stop working.

Hawkins v. First Union Corp. Long-Term Disability Plan, 326 F.3d 914, 918 (7th Cir. 2003) (internal citations omitted).

Defendants cite to Drs. Bakst, Schim, and Ireland for statements suggesting that Plaintiff was in a state of analgesic rebound stemming from his continuous and prolonged use of potent analgesic pain medications. (Id. at PRU108; PRU81; PRU93.) Prudential's independent specialist, upon review of Plaintiff's medical records, suggested that Plaintiff's only illness was substance abuse, and proffered that Plaintiff might be "malingering to get drugs." (Id. at PRU308-9.)

### C. Facts Opposing Summary Judgment

Plaintiff's case rests primarily on statements by doctors suggesting that his headaches are legitimate, disabling, and perhaps caused by trauma related to a 1975 head injury.

Regarding the severity of the headaches, Plaintiff cites to Dr. Moss's statements reporting that Plaintiff's headaches are "continual, severe, and disabling"[9] and stating that Plaintiff had been "unable to concentrate, read, or function intellectually." (Id. at PRU245.) Plaintiff also cites to Dr. Abdulhadi's comments reporting a daily headache, with Plaintiff scoring the pain between a six and eight on a zero to ten scale, and noting that Plaintiff was "disabled as he is limited by his headache and neck pain." (Id. at PRU125.) Plaintiff also points to the fact that the Social Security Administration declared him disabled per their definition as of July 9, 2002. (Id. at PRU176.) Additionally, Plaintiff notes the dramatic loss of weight he experienced beginning in 2002.

For evidence linking the headaches to the 1975 head injury, Plaintiff cites to a 1997 radiology report stating: "The height of the C6 vertebrae appears slightly diminished . . . Perhaps this is related to some prior trauma." (Id. at PRU353.) Plaintiff also cites to a 2002 radiology report indicating that the "[m]ild associated degenerate change [found in his spine] is suggestive of old injury." (Id. at PRU356.) Plaintiff also relies upon the report of Dr. Farrow, which was based on the doctor's numerous neuropsychological examinations. Dr. Farrow stated that he had reason to believe that Plaintiff suffered a "rather severe concussion" twenty years prior, and opined that "the diagnosis of post-traumatic headache

---

[9] It must be noted that the doctor's definition of "disabling" is not necessarily that of the Plan.

seems likely." (Id. at PRU333.)

In rebuttal to Defendants' claims of causation by analgesic rebound, Plaintiff cites to Dr. Ireland's report, which indicates Plaintiff's success in discontinuing the use of narcotics without relief. (Id. at PRU91.)

### D. Genuine Issues of Material Fact

Admittedly, the issue of Plaintiff's alleged disability is complex. Viewed in the light most favorable to the Plaintiff, the evidence supporting Defendants' views does not negate the similarly convincing and valid evidence confirming the severity of Plaintiff's pain, and offering some physiological explanation therefor. As such, summary judgment is inappropriate in this instance.

Genuine issues of material fact remain as to: 1) whether Plaintiff's pain was in fact severe enough to render him unable to perform the material and substantial duties of his occupation; 2) what these material and substantial duties were, and at what level of pain they could have been performed; 3) the cause of Plaintiff's pain; 4) whether this pain had increased beginning in 2002; and 5) whether the Plan required an increase in pain to qualify Plaintiff as disabled. Furthermore, genuine issues remain regarding whether Plaintiff's alleged disability was work-related, thereby excluding him from STD benefits for the remainder of that clause's applicable time period.

Resolution of these issues is necessary to determine whether Plaintiff was in fact disabled per the Plan, such that he was unable to perform the material and substantial duties of his occupation. These facts are material, in that they are at the heart of Plaintiff's claim, and genuine, in that a reasonable trier of fact could find for the Plaintiff based on the evidence in the record. In light of the amount of evidence on both sides of the case, it is properly left for the fact-finder, after a full *de novo* review of the entire record submitted to the Court at that time, to determine the weight to assign to any piece of relevant evidence. On the record before the Court, it cannot be concluded that Plaintiff cannot meet his burden of proof to establish disability under the Plan. Rather, a reasonable trier of fact, on *de novo* review, could find that Plaintiff was disabled under the Plan.

**IV. Conclusion**

For the foregoing reasons, material issues of fact remain in dispute as to Plaintiff's entitlement to short and long term disability benefits per the Plan. Accordingly, Defendants' motion for summary judgement is **DENIED**.[10]

**IT IS SO ORDERED.**

DATED: June 11, 2007

_____
Hon. Barry Ted Moskowitz
United States District Judge

---

[10] Plaintiff has requested oral argument in opposition to Defendants' motion for summary judgment. As the Court finds summary judgment inappropriate in this case, that request is denied.